## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CHARLES TERRY** | ) |
| **311 Inlet Road** | ) |
| **Murrells Inlet, S.C. 29576** | ) |
|          **Plaintiff** | ) |
| | ) |
|      **v.** | )   **Civil Action** |
| | ) |
| **THE ARCHITECT OF THE CAPITOL** | ) |
| **c/o General Counsel** | ) |
| **Ford House Office Building H2-265A** | ) |
| **Second and D Streets SW** | ) |
| **Washington, DC 20515** | ) |
|          **Defendant** | ) |
| | ) |

## COMPLAINT

Plaintiff, Charles Terry, brings this civil action against Defendant, the Architect of the Capitol (AOC) because the AOC has retaliated against him and created a hostile working environment against him based on his protected workplace safety complaints, relating to unsafe lead abatement practices. Facing spending pressures, the Architect stopped using professional hazardous materials experts to abate lead paint from the Buildings that House Congressional Offices. Rather than pay professionals to do the abatement work, the Architect assigned its painters and plasterers to perform the abatement with minimal training and supervision. Due to their lack of training and experience, as well as irresponsible and dangerous work instructions, numerous instances of unsafe work practices caused Plaintiff and others to ingest dangerous lead containing dust.

After Mr. Terry complained to the Office of Compliance, the Architect safety officials and his supervisors, the Architect retaliated against him by creating a hostile work environment

and by depriving him a promotion, overtime assignments and flexible Alternative Work Schedule benefits that had previously been available to him and other painters.

Additionally, the Architect has failed to change Mr. Terry's "Rate of Basic Pay" to include the 8% environmental hazard pay premium to which he is entitled.

## JURISDICTION

1.  Plaintiff invokes the jurisdiction of this Court pursuant to the Congressional Accountability Act of 1995 (2 U.S.C. §1408 (a)), as well as 28 U.S.C. § 1331 (Federal Question).

2.  This is an action authorized and instituted pursuant to the Congressional Accountability Act, (2 U.S.C. § 1301 *et seq*.).

3.  The unlawful employment practices alleged in this Complaint were committed in the District of Columbia.

4.  Plaintiff is a current employee of the Architect of the Capitol.

5.  Defendant Architect of the Capitol (Architect or AOC) is an "Employing Office" covered by the Congressional Accountability Act (2 U.S.C. § 1301(9)(D)).

6.  AOC is headquartered in the District of Columbia.

7.  The Congressional Accountability Act makes it unlawful for the Architect to "intimidate, take reprisal against, or otherwise discriminate against, any covered employee because the covered employee has opposed any practice made unlawful by [the] Act." 2 U.S.C. § 1317.

8.  2 U.S.C. § 1313 of the Congressional Accountability Act extends the rights and protections of 29 U.S.C. §§ 206(a)(1) and (d), as well as 29 U.S.C. § 207, and 29 U.S.C. § 212(c) of the Fair Labor Standards Act to employees of the Architect of the

Capitol and required the Board of the Office of Compliance to propound regulations to implement the above-referenced sections of the Fair Labor Standards Act.

9.   2 U.S.C. 1313(a) requires the Architect to pay Plaintiff wages at his Rate of Basic Pay.

10.   The regulations applicable to the Architect require the Architect to pay Wage Grade employees, such as Mr. Terry, their Rate of Basic Pay, which includes "The scheduled rate of pay plus any applicable night shift or environmental differential."

11.   The regulations applicable to the Architect require the Architect to pay Wage Grade employees, such as Mr. Terry, overtime calculated at 1.5 times the employee's Rate of Basic Pay, which includes "The scheduled rate of pay plus any applicable night shift or environmental differential."

12.   The Architect's internal regulations (*inter alia*), including HRMD Manual Chapter 532 (Appendix B), require it to include an 8% environmental hazard pay premium in Plaintiff's Rate of Basic Pay because he is required to work in "close proximity to poisons (toxic chemicals) which involves potential serious personal injury such as permanent or temporary, partial or complete loss of faculties and/or loss of life including exposure of an unusual degree to toxic chemicals, dust, or fumes of equal toxicity generated in work situations by processes [and/or] required to perform work assignments wherein protective devices and/or safety measures have been developed but have not practically eliminated the potential for such personnel injury."

13.   Plaintiff has satisfied all administrative and judicial prerequisites to the institution of this action. The Plaintiff filed a timely Request for Counseling on March 20, 2018 to raise his retaliatory hostile work environment claim at the Office of Compliance.

Plaintiff filed a second Request for counseling to include the wage theft and discrete

acts of retaliation, as well as the continuing hostile work environment on May 3,

2018. Both of the complaints were filed within 180 days of the retaliatory and/or

unlawful conduct at issue here.  Plaintiff engaged in the counseling process and filed

a timely Request for Mediation in both cases (on May 3, 2018 and May 11, 2018,

respectively) at the conclusion of the Counseling Periods.  Mediation in both cases

closed on June 11, 2018, and Plaintiff files this suit after the expiration of 30 days

from the end of the Mediation Period, and before the expiration of 90-days.

## FACTS

14.   Plaintiff is currently employed as a WG-9 Painter at the Architect, in the House

Office Buildings Jurisdiction.

15.   Plaintiff regularly works the night shift, which entitles him to a 10% premium

calculated in his Rate of Basic Pay.

16.   Beginning in approximately January 2018, Plaintiff has regularly been required to

either abate lead paint without proper safety equipment and/or precautions or to work

in close proximity to other Architect employees who are abating lead paint without

proper safety equipment and/or safety precautions.

17.   Because he reasonably feared that the exposure to lead paint could cause serious

injury or death to himself, other employees and members of the public, including

Congress and its staff, Mr. Terry filed a workplace safety complaint at the Office of

Compliance on February 6, 2018.

18.   Mr. Terry's supervisors learned that he was responsible for the workplace safety

complaint immediately because Mr. Terry waived his right to confidentiality in order

to attain a faster investigation and enforcement action.

19.     On February 12, 2018 the Office of Compliance's Occupational Safety and Health

        Specialists, among others, met with Superintendent Weidemeyer, Asst.

        Superintendent Ryan Columbo, and Safety Specialist David Hicks, as well as other

        employees of the Architect, including an attorney from the Office of General

        Counsel.

20.     In response to the Office of Compliance investigation, the Architect produced

        documents that allegedly explained the applicable lead abatement rules and

        procedures. The problem was that, while the Architect had written procedures for

        safely handling lead paint, those procedures were not being followed and the Painters

        were not being supervised by individuals who were experienced with lead abatement.

21.     As a part of the Office of Compliance's investigation, the Occupational Safety and

        Health scheduled an agreed time to review the Painters performing lead abatement.

22.     Even with advanced notice of the inspection, the Occupational Safety and Health

        Specialists found several safety deficiencies.

23.     First, the Occupational Safety and Health review determined that the Architect was

        violating the standard that "requires that at the outset of operations covered by the

        lead standard, the employer 'shall initially determine if any employee may be

        exposed to lead at or above the action level." Where lead is present, until the

        employer performs an initial exposure assessment and documents that employees

        performing the work are not exposed above the PEL, the employer must treat

        employees as if they are exposed above the PEL and implement appropriate employee

        protective measures, including the provision of respiratory protection, personal

protective clothing and equipment, change areas, hand washing facilities, biological

monitoring, and training." *Office of Compliance Report OSH 2018-03, June 1, 2018*

(referring to violations of 29 C.F.R. § 1926.62(d)(1) and (d)(2)). The Office of

Compliance found that this violation "could lead to death or permanent total

disability, and that without regular exposure monitoring such an outcome might

possibly occur in time."

24.     Second, the Occupational Safety and Health review concluded that the Architect was

violating the standard that "requires that all surfaces shall be maintained as free as

practicable of accumulations of lead, and that clean-up methods must minimize the

likelihood of lead becoming airborne." *Office of Compliance Report OSH 2018-03,*

*June 1, 2018* (referring to violations of 29 C.F.R. 1926.62(h)). The Office of

Compliance found that this violation "could lead to death or permanent total

disability, and that without regular exposure monitoring such an outcome might

possibly occur in time."

25.     Also in February 2018, Mr. Terry asked (through an intermediary, George Andreas)

Andrew Reed for a full-face proper respirator.  Mr. Reed stated that Mr. Terry did not

require a proper respirator for the work he was performing.

26.     On March 13, 2018, Alan Redkey falsely claimed that Mr. Terry had spilled or

splattered paint on the carpet of the room where he had been painting.  Mr. Terry

asked Redkey to show him the paint, and Redkey was unable to do so.

27.     On or about March 17, 2018, Mr. Terry complained, during a shop meeting, that Alan

Redkey had instructed him to sand a door that was painted with lead paint, without a

respirator and contrary to the Architect's new lead paint abatement protocols.

28.    On April 15, 2018 Mr. Terry submitted a formal statement to his supervisors,

       including his safety complaints about having to sand down the door without proper

       Personal Protective Equipment.

29.    On or about April 17, 2018, Mr. Terry complained to Gerald Owens (work leader)

       about working adjacent to an employee who was abating lead paint in violation of the

       safety protocols (i.e. not wetting the area down, not using glove bags to collect the

       lead paint and not posting signs to warn the public of the danger).

30.    Later on April 15, 2018, the Night Shift Supervisor, John (Kenny) Buckler told Mr.

       Terry that Charles (Charlie) Bryan (Shop foreman) had instructed him not to speak to

       Mr. Terry any more.

31.    On April 16, 2018 Andrew Reed (Safety Officer) accused Mr. Terry of having lied

       about not being given a proper respirator.

32.    On or about April 24, 2018 the day shift was assigned to work a project on overtime

       hours. Under normal circumstances, the overtime assignment would have been shared

       between day and night shift.  Mr. Redkey explained that day shift had been given the

       assignment because the project involved painting with "special colors," but the

       excuse was false, because night shift painters regularly used "special colors."

33.    On or about May 8, 2018, Mr. Terry asked Ryan Columbo for permission to change

       his Alternate Work Schedule (AWS) day off (on one occasion) to Monday, May 28,

       2018 – rather than Friday, May 25, 2018.  Columbo refused to permit Mr. Terry to

       move his AWS day, even though the shop had honored similar requests on other

       occasions.

34.    On May 2, 2018, Mr. Terry asked the Assistant Night Shift Supervisor, Alan Redkey

about a career ladder promotion to WG10 because he had the time in grade and was

working at the next level. On or about May 9, 2018, Assistant Superintendent

Columbo responded that no ladder promotion was possible. This was contrary to past

practice in the Paint shop.

35.    On May 22, 2018 one of Mr. Terry's co-workers expressed his displeasure toward

Mr. Terry, saying that no one could change their AWS day off because "someone"

(with the implication that it was Mr. Terry) had made a complaint about it.

36.    On July 11, 2018 Mr. Terry informed the Office of Compliance Occupational Safety

and Health Specialists that lead abatement work continued to be performed in an

unsafe manner. Specifically, Mr. Terry advised the Occupational Safety and Health

Specialists that large areas of the hallways in the Longworth Building were being

abated with no containment in place while the building was open to the public.

## COUNT I: RETALIATION FOR PROTECTED WORKPLACE SAFETY COMPLAINT

37.    Plaintiff repeats and reavers each of the foregoing paragraphs as if they were

specifically restated here.

38.    Plaintiff engaged in numerous instances of protected workplace safety complaints

because he reasonably believed that the workplace conditions posed a significant

threat of death or serious injury to himself and others when he complained to the

Office of Compliance (on February 6, 2018 and July 11, 2018) and internally (on or

about March 17, 2018, April 15, 2018 and April 17, 2018).

39.    Defendant retaliated against Plaintiff for his protected workplace safety complaints,

in violation of the Congressional Accountability Act, when it denied him overtime

opportunities, rejected his request for a ladder promotion to WG-10 and denied his

request to change his AWS day off.

40. As a result of the AOC's unlawful conduct, Plaintiff has suffered economic damages, in the form of lost income, and lost retirement credit and future income.

41. As a result of the AOCs unlawful conduct, Plaintiff has suffered emotional pain and suffering, stress, fear, embarrassment, humiliation, inconvenience, feelings of depression and anxiety and fear of losing his job.

## COUNT II: HOSTILE WORK ENVIRONMENT

42. Plaintiff repeats and reavers each of the foregoing paragraphs as if they were specifically restated here.

43. Defendant imposed a retaliatory hostile work environment, in violation of the Congressional Accountability Act, against Plaintiff by:

a. Denying him overtime opportunities;

b. Rejecting his request for a ladder promotion to WG-10;

c. Denying his request to change his AWS day off;

d. Accusing him of lying about workplace safety concerns;

e. Freezing him out of communications with his supervisors, including John Buckler;

f. Requiring him to work in unsafe conditions and without the proper personal protective equipment;

g. Turning his coworkers against him by informing them about his complaints and indicating that the coworkers no longer have certain privileges or flexibility because of Mr. Terry's complaints.

44. The hostile work environment was targeted at Plaintiff because of his protected

workplace safety complaint.

45.     As a result of the hostile work environment, Plaintiff has suffered emotional pain and

suffering, stress, fear, embarrassment, humiliation, inconvenience, feelings of

depression and anxiety and fear of losing his job.

## COUNT III: WAGE THEFT

46.     Plaintiff repeats and reavers each of the foregoing paragraphs as if they were

specifically restated here.

47.     Due to the fact that Plaintiff regularly works in close proximity to a toxic substance

(lead paint), Plaintiff is entitled to an environmental hazard differential pay of 8% to

be included in his Base Rate of Pay.

48.     The Architect of the Capitol has never paid Plaintiff the environmental hazard pay to

which he is entitled.

49.     Plaintiff is entitled to his lost wages because of the Architect's failure to pay him

environmental hazard pay, as well as liquidated damages.


WHEREFORE, Plaintiff prays that this Court: (i) declare that the employment practices

complained of in this Complaint are unlawful in that they violate the Congressional

Accountability Act; (ii) permanently enjoin the Defendant and its agents, officers and employees

from engaging in all practices found by this Court to be in violation of the Congressional

Accountability Act; (iii) order the Defendant to make the Plaintiff whole by paying him any

monetary and/or liquidated damages proved at trial in addition to compensatory damages in an

amount to be determined at trial; (iv) retain jurisdiction over this action to ensure full compliance

with the Court's orders and require the Defendant to file such reports as the Court deems

necessary to evaluate such compliance; (v) order the Defendant to pay Plaintiff's costs and

expenses and reasonable attorneys' fees in connection with this action; and (vi) grant such other

and further relief to the Plaintiff as the Court deems just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY**

Respectfully Submitted,
ALDERMAN, DEVORSETZ & HORA, PLLC

Leslie D. Alderman III (D.C. # 477750)
1025 Connecticut Ave., NW
Suite 615
Washington, DC 20036
Tel: 202-969-8220
Fax: 202-969-8224
lalderman@adhlawfirm.com
Attorney for the Plaintiff