IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CHARLES TERRY** )<br>         **Plaintiff** )<br>)<br>**v.** )<br>)<br>**THE ARCHITECT OF THE** )<br>**CAPITOL** )<br>         **Defendant** ) | **Civil Action 18-1733 (RBW)**<br>(Consolidated with Case No. 18-2585) |

**AMENDED COMPLAINT**

Plaintiff, Charles Terry, brings this civil action against Defendant, the Architect of the Capitol (AOC) because the AOC has retaliated against him and created a hostile working environment against him based on his protected workplace safety complaints, relating to unsafe lead abatement practices. Facing spending pressures, the Architect stopped using professional hazardous materials experts to abate lead paint from the buildings that house Congressional offices. Rather than pay professionals to do the abatement work, the Architect assigned its painters and plasterers to perform the abatement with minimal training and supervision. Due to their lack of training and experience, as well as irresponsible and dangerous work instructions, numerous instances of unsafe work practices caused Plaintiff and others to ingest dangerous lead containing dust.

After Mr. Terry complained to the Office of Compliance, the Architect safety officials and his supervisors, the Architect retaliated against him by creating a hostile work environment and by depriving him a promotion, overtime assignments and flexible Alternative Work Schedule benefits that had previously been available to him and other painters.

Additionally, the Architect never calculated Mr. Terry's "Rate of Basic Pay" to include the 8% environmental hazard pay premium to which he is entitled, consequently the failure to calculate

Mr. Terry's overtime rate of pay to include the 8% hazard pay premium violated the Congressional Accountability Act.

## JURISDICTION

1. Plaintiff invokes the jurisdiction of this Court pursuant to the Congressional Accountability Act of 1995 (2 U.S.C. §1408 (a)), as well as 28 U.S.C. § 1331 (Federal Question).

2. Relief is also sought herein pursuant to 5 U.S.C. § 5596 (Back Pay Act), 28 U.S.C. § 2201 (Declaratory Judgment Act).

3. This is an action authorized and instituted pursuant to the Congressional Accountability Act, (2 U.S.C. § 1301 *et seq*.).

4. The unlawful employment practices alleged in this Complaint were committed in the District of Columbia.

5. Plaintiff is a current employee of the Architect of the Capitol.

6. Defendant Architect of the Capitol (Architect or AOC) is an "Employing Office" covered by the Congressional Accountability Act (2 U.S.C. § 1301(9)(D)).

7. AOC is headquartered in the District of Columbia.

8. The Congressional Accountability Act makes it unlawful for the Architect to "intimidate, take reprisal against, or otherwise discriminate against, any covered employee because the covered employee has opposed any practice made unlawful by [the] Act." 2 U.S.C. § 1317.

9. 2 U.S.C. § 1313 of the Congressional Accountability Act extends the rights and protections of 29 U.S.C. §§ 206(a)(1) and (d), as well as 29 U.S.C. § 207, and 29 U.S.C. § 212(c) of the Fair Labor Standards Act to employees of the Architect of the

Capitol and required the Board of the Office of Compliance to propound regulations to implement the above-referenced sections of the Fair Labor Standards Act.

10. 2 U.S.C. 1313(a) requires the Architect to pay Plaintiff wages at his Rate of Basic Pay.

11. The regulations applicable to the Architect require the Architect to pay Wage Grade employees, such as Mr. Terry, their Rate of Basic Pay, which includes "[t]he scheduled rate of pay plus any applicable night shift or environmental differential."

12. The regulations applicable to the Architect require the Architect to pay Wage Grade employees, such as Mr. Terry, overtime calculated at 1.5 times the employee's Rate of Basic Pay, which includes "The scheduled rate of pay plus any applicable night shift or environmental differential."

13. At issue here are the Architect's regulations governing working under hazardous circumstances which read, in pertinent part:

9(e) Environmental Differentials

(1) An AWS employee is entitled to environmental differential when performing assigned duties that expose him/her to an unusually severe hazard, physical hardship, or working condition as described in either Appendix A or Appendix B of this chapter that occurred on or after the effective date specified.

…

(2) Prior to directing an employee to work in conditions that may be hazardous, the AOC manager or supervisor must request an evaluation of the proposed work, work site and working conditions by the Safety and Environmental Division (SED). The SED shall:

    (a) Verify the propriety and condition of all portable safety equipment.
    (b) Determine that employees who will perform the work have received any AOC- or OSHA-mandated training.
    (c) If required, verify that employees who will perform the work have received medical clearance to perform anticipated tasks.

(d)  Visit the work site to observe and analyze field conditions and determine whether the conditions are hazardous.

(e)  Review applicable AOC Safety Policies and OSHA regulations to validate findings and prepare a pre-work safety plan when required.

(f) Develop a report containing findings and recommendations of whether work should be proceed as planned and how potential hazards should be mitigated.

(3) Should the work situation continue to be hazardous, the AOC Manager or Supervisor shall authorize payment of an environmental differential to employees who will be assigned to perform work. The following shall be documented in writing to support the need for payment of an environmental differential:

(a) A description of the proposed work.

(b) A description of the unusually severe working conditions or unusually severe hazards.

(c) The name, position title, grade and organization of the employee(s) who will be performing the work.

(d) An estimate of the amount of time required for each employee to carry out the work assignment(s).

(e) A statement that SED was consulted concerning the proposed work assignment and the date of SED's report of findings and recommendations.

(f) Upon completion of the work, the beginning and ending time of each employee's exposure to the unusually severe hazard, physical hardship or working condition will be annotated.

(4) A copy of the documentation shall be filed with the timecard of each employee who performed the work.

f.  On occasions where there is not sufficient lead time to follow the process outlined in paragraph 9.e.(1)-(3), above, the following abbreviated process may be followed:

(1) The AOC Manager or Supervisor makes a telephone call to SED requesting an occupational safety and health review of the proposed work, work site and working conditions.

(2) SED expedites their review of the proposed work, site and working conditions.

(3) In consultation with SED, the AOC Manager or Supervisor ensures appropriate steps will be taken to address any health/safety issues raised.

    (4) The AOC Manager or Supervisor documents the need for environmental differential pay in writing, providing the information requested in 9(e)(3)( a)-( e), above.

    (5) Upon completion of the work, the beginning and ending time of each employee's exposure to the unusually severe hazard, physical hardship or working condition will be annotated.

14. Appendix B, which contains the environmental hazard premium pay applicable here, includes, in section 4 working with "poisons (toxic materials)" including "Handling and storing toxic chemical agents …; examining of material for signs of leakage or deteriorated material; decontaminating equipment and work sites; work relating to disposal of deteriorated material (exposure to conjunctivitis, pulmonary edema, blood infection, impairment of the nervous system, possible death). *See* Exhibit 1 at p. 36. Plaintiff contends that this, and possibly other portions of the appendix includes removal of lead-based paint. Additionally, Appendix B, section 16 specifically refers to "Asbestos. Working in an area where airborne concentrations of asbestos fibers may expose employees to potential illness of injury and protective devices or safety measures have not practically eliminated the potential for such personal illness or injury."

15. These rules are intended to protect the painters, plasterers (like Plaintiff) plumbers, electricians, and insulators, among others, who undertake such hazardous duties as identifying, remediating and abating lead paint and asbestos containing materials, and to make sure they are compensated for the hazardous circumstances in which they are required to work are written in unambiguously mandatory language.

16. Plaintiff has satisfied all administrative and judicial prerequisites to the institution of this action. The Plaintiff filed a timely Request for Counseling on March 20, 2018 to raise his retaliatory hostile work environment claim at the Office of Compliance.

Plaintiff filed a second Request for counseling to include the wage theft and discrete acts of retaliation, as well as the continuing hostile work environment on May 3, 2018. Both of the complaints were filed within 180 days of the retaliatory and/or unlawful conduct at issue here.  Plaintiff engaged in the counseling process and filed a timely Request for Mediation in both cases (on May 3, 2018 and May 11, 2018, respectively) at the conclusion of the Counseling Periods.  Mediation in both cases closed on June 11, 2018, and Plaintiff files this suit after the expiration of 30 days from the end of the Mediation Period, and before the expiration of 90-days.

## FACTS

17. Plaintiff was employed as a WG-9 Painter at the Architect, in the House Office Buildings Jurisdiction.
18. Plaintiff regularly worked the night shift, which entitles him to a 10% premium calculated in his Rate of Basic Pay.
19. Beginning in approximately January 2018, Plaintiff was regularly required to either abate lead paint without proper safety equipment and/or precautions or to work in close proximity to other Architect employees who are abating lead paint without proper safety equipment and/or safety precautions.
20. Plaintiff frequently performed the lead paint abatement (or remediation) during the time of his employment.  Plaintiff's records reflect that he worked the following overtime hours; on each instance he worked overtime, Mr. Terry was ordered to perform lead paint abatement/remediation:

    a. 8.5 hrs 01/17/2018
    b. 8 hrs 03/04/20118

    c.  8 hrs 03/18/2018

    d.  8 hrs 04/01/2018

    e.  8 hrs 04/15/2018

    f.  8 hrs 05/13/2018

21. Plaintiff asserts that there are additional dates on which he worked overtime, but he no longer has access to his time records, since he is no longer employed at the Architect of the Capitol.

22. Plaintiff's supervisors and managers never undertook the mandatory duties under the Environmental Hazard policy described above in paragraphs 13 and 14.

23. Because he reasonably feared that the exposure to lead paint could cause serious injury or death to himself, other employees and members of the public, including Congress and its staff, Mr. Terry filed a workplace safety complaint at the Office of Compliance on February 6, 2018.

24. Mr. Terry's supervisors learned that he was responsible for the workplace safety complaint immediately because Mr. Terry waived his right to confidentiality in order to attain a faster investigation and enforcement action.

25. On February 12, 2018 the Office of Compliance's Occupational Safety and Health Specialists, among others, met with Superintendent Weidemeyer, Asst. Superintendent Ryan Columbo, and Safety Specialist David Hicks, as well as other employees of the Architect, including an attorney from the Office of General Counsel.

26. In response to the Office of Compliance investigation, the Architect produced documents that allegedly explained the applicable lead abatement rules and

procedures. The problem was that, while the Architect had written procedures for safely handling lead paint, those procedures were not being followed and the Painters were not being supervised by individuals who were experienced with lead abatement.

27. As a part of the Office of Compliance's investigation, the Occupational Safety and Health scheduled an agreed time to review the Painters performing lead abatement.

28. Even with advanced notice of the inspection, the Occupational Safety and Health Specialists found several safety deficiencies.

29. First, the Occupational Safety and Health review determined that the Architect was violating the standard that "requires that at the outset of operations covered by the lead standard, the employer 'shall initially determine if any employee may be exposed to lead at or above the action level.'" Where lead is present, until the employer performs an initial exposure assessment and documents that employees performing the work are not exposed above the PEL, the employer must treat employees as if they are exposed above the PEL and implement appropriate employee protective measures, including the provision of respiratory protection, personal protective clothing and equipment, change areas, hand washing facilities, biological monitoring, and training." *Office of Compliance Report OSH 2018-03, June 1, 2018* (referring to violations of 29 C.F.R. § 1926.62(d)(1) and (d)(2)). The Office of Compliance found that this violation "could lead to death or permanent total disability, and that without regular exposure monitoring such an outcome might possibly occur in time."

30. Second, the Occupational Safety and Health review concluded that the Architect was violating the standard that "requires that all surfaces shall be maintained as free as

practicable of accumulations of lead, and that clean-up methods must minimize the likelihood of lead becoming airborne." *Office of Compliance Report OSH 2018-03, June 1, 2018* (referring to violations of 29 C.F.R. 1926.62(h)). The Office of Compliance found that this violation "could lead to death or permanent total disability, and that without regular exposure monitoring such an outcome might possibly occur in time."

31. Also in February 2018, Mr. Terry asked (through an intermediary, George Andreas) Andrew Reed (Safety Officer) for a full-face proper respirator. Mr. Reed stated that Mr. Terry did not require a proper respirator for the work he was performing.

32. On March 13, 2018, Alan Redkey falsely claimed that Mr. Terry had spilled or splattered paint on the carpet of the room where he had been painting. Mr. Terry asked Redkey to show him the paint, and Redkey was unable to do so.

33. On or about March 17, 2018, Mr. Terry complained, during a shop meeting, that Alan Redkey had instructed him to sand a door that was painted with lead paint, without a respirator and contrary to the Architect's new lead paint abatement protocols.

34. On April 15, 2018 Mr. Terry submitted a formal statement to his supervisors, including his safety complaints about having to sand down the door without proper Personal Protective Equipment.

35. On or about April 17, 2018, Mr. Terry complained to Gerald Owens (work leader) about working adjacent to an employee who was abating lead paint in violation of the safety protocols (i.e. not wetting the area down, not using glove bags to collect the lead paint and not posting signs to warn the public of the danger).

36. Later on April 15, 2018, the Night Shift Supervisor, John (Kenny) Buckler told Mr.

Terry that Charles (Charlie) Bryan (Shop foreman) had instructed him not to speak to Mr. Terry any more.

37. On April 16, 2018 Andrew Reed accused Mr. Terry of having lied about not being given a proper respirator.

38. On or about April 24, 2018 the day shift was assigned to work a project on overtime hours. Under normal circumstances, the overtime assignment would have been shared between day and night shift. Mr. Redkey explained that day shift had been given the assignment because the project involved painting with "special colors," but the excuse was false, because night shift painters regularly used "special colors."

39. On or about May 8, 2018, Mr. Terry asked Ryan Columbo for permission to change his Alternate Work Schedule (AWS) day off (on one occasion) to Monday, May 28, 2018 – rather than Friday, May 25, 2018. Columbo refused to permit Mr. Terry to move his AWS day, even though the shop had honored similar requests on other occasions.

40. On May 2, 2018, Mr. Terry asked the Assistant Night Shift Supervisor, Alan Redkey about a career ladder promotion to WG10 because he had the time in grade and was working at the next level. On or about May 9, 2018, Assistant Superintendent Columbo responded that no ladder promotion was possible. This was contrary to past practice in the Paint shop.

41. On May 22, 2018 one of Mr. Terry's co-workers expressed his displeasure toward Mr. Terry, saying that no one could change their AWS day off because "someone" (with the implication that it was Mr. Terry) had made a complaint about it, suggesting that Defendant had altered its practice of allowing changes to AWS days to cover up

its retaliation against Plaintiff.

42. On July 11, 2018 Mr. Terry informed the Office of Compliance Occupational Safety and Health Specialists that lead abatement work continued to be performed in an unsafe manner. Specifically, Mr. Terry advised the Occupational Safety and Health Specialists that large areas of the hallways in the Longworth Building were being abated with no containment in place while the building was open to the public.

**COUNT I: RETALIATION FOR PROTECTED WORKPLACE SAFETY COMPLAINT**

43. Plaintiff repeats and reavers each of the foregoing paragraphs as if they were specifically restated here.

44. Plaintiff engaged in numerous instances of protected workplace safety complaints because he reasonably believed that the workplace conditions posed a significant threat of death or serious injury to himself and others when he complained to the Office of Compliance (on February 6, 2018 and July 11, 2018) and internally (on or about March 17, 2018, April 15, 2018 and April 17, 2018).

45. Defendant retaliated against Plaintiff for his protected workplace safety complaints, in violation of the Congressional Accountability Act, when it denied him overtime opportunities, rejected his request for a ladder promotion to WG-10 and denied his request to change his AWS day off.

46. As a result of the AOC's unlawful conduct, Plaintiff has suffered economic damages, in the form of lost income, and lost retirement credit and future income.

47. As a result of the AOCs unlawful conduct, Plaintiff has suffered emotional pain and suffering, stress, fear, embarrassment, humiliation, inconvenience, feelings of depression and anxiety and fear of losing his job.

## COUNT II: HOSTILE WORK ENVIRONMENT

48. Plaintiff repeats and reavers each of the foregoing paragraphs as if they were specifically restated here.

49. Defendant imposed a retaliatory hostile work environment, in violation of the Congressional Accountability Act, against Plaintiff by:

   a. Denying him overtime opportunities;

   b. Rejecting his request for a ladder promotion to WG-10;

   c. Denying his request to change his AWS day off;

   d. Accusing him of lying about workplace safety concerns;

   e. Freezing him out of communications with his supervisors, including John Buckler;

   f. Requiring him to work in unsafe conditions and without the proper personal protective equipment;

   g. Turning his coworkers against him by informing them about his complaints and indicating that the coworkers no longer have certain privileges or flexibility because of Mr. Terry's complaints.

50. The hostile work environment was targeted at Plaintiff because of his protected workplace safety complaints.

51. As a result of the hostile work environment, Plaintiff has suffered emotional pain and suffering, stress, fear, embarrassment, humiliation, inconvenience, feelings of depression and anxiety and fear of losing his job.

## COUNT III: WAGE THEFT

52. Plaintiff repeats and reavers each of the foregoing paragraphs as if they were

specifically restated here.

53. Due to the fact that Plaintiff regularly works in close proximity to toxic substances (including lead paint), Plaintiff was entitled to an environmental hazard differential pay of 8% to be included in his Base Rate of Pay, including when he works overtime.

54. Plaintiff worked overtime, performing hazardous work involving close proximity to poisons and/or toxic materials on several occasions between September 21, 2017 (180-days before he initiated proceedings at the Office of Compliance, now known as the Office of Congressional Workplace Rights), including the specifically identified occasions referenced in paragraph 20, above.

55. The Architect of the Capitol never paid Plaintiff the environmental hazard pay to which he was entitled on either regular time or overtime.

56. Plaintiff is entitled to his lost wages because of the Architect's failure to pay him environmental hazard pay and liquidated damages under the Congressional Accountability Act, as well as backpay – pursuant to 5 U.S.C. § 5596.

## COUNT III: DECLARATORY RELIEF AND BACKPAY

57. Plaintiff repeats and reavers each of the foregoing paragraphs as if they were specifically restated here.

58. Due to the fact that Plaintiff regularly worked in close proximity to toxic substances (including lead paint), Plaintiff is entitled to a Declaratory Judgment that he was entitled to the environmental hazard differential pay of 8% to be included in his Base Rate of Pay for all hours that he works on regular time, in addition to overtime.

59. The Architect of the Capitol has never paid Plaintiff the environmental hazard pay to which he is entitled on either regular time or overtime.

60. Plaintiff requests Declaratory Relief, pursuant to 28 U.S.C. § 2201, in the form of a judicial declaration that he is entitled to backpay to include the 8% environmental hazard pay, calculated back to September 21, 2017 – pursuant to 5 U.S.C. § 5596.

WHEREFORE, Plaintiff prays that this Court: (i) declare that the employment practices complained of in this Complaint are unlawful in that they violate the Congressional Accountability Act; (ii) permanently enjoin the Defendant and its agents, officers and employees from engaging in all practices found by this Court to be in violation of the Congressional Accountability Act; (iii) order the Defendant to make the Plaintiff whole by paying him any monetary and/or liquidated damages proved at trial in addition to compensatory damages in an amount to be determined at trial; (iv) retain jurisdiction over this action to ensure full compliance with the Court's orders and require the Defendant to file such reports as the Court deems necessary to evaluate such compliance; (v) order the Defendant to pay Plaintiff's costs and expenses and reasonable attorneys' fees in connection with this action; and (vi) grant such other and further relief to the Plaintiff as the Court deems just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY**

Respectfully Submitted,
ALDERMAN, DEVORSETZ & HORA, PLLC

Leslie D. Alderman III (D.C. # 477750)
1025 Connecticut Ave., NW
Suite 615
Washington, DC 20036
Tel: 202-969-8220

Fax: 202-969-8224
lalderman@adhlawfirm.com
Attorney for the Plaintiff