**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                       )
CHARLES TERRY,                         )
                                       )
            Plaintiff,                 )
                                       )
      v.                               )      Civil Action No. 18-1733 (RBW)
                                       )
ARCHITECT OF THE CAPITOL,              )
                                       )
                                       )
            Defendant.                 )
_____       )
                                       )
CHARLES TERRY,                         )
                                       )
            Plaintiff,                 )
                                       )
      v.                               )      Civil Action No. 18-2585 (RBW)
                                       )
ARCHITECT OF THE CAPITOL,              )
                                       )
                                       )
            Defendant.                 )
_____       )

## <u>MEMORANDUM OPINION</u>

The plaintiff, Charles Terry, brings these consolidated actions against the defendant, the

Architect of the Capitol, alleging violations of the Congressional Accountability Act of 1995 (the

"Accountability Act"), 2 U.S.C. §§ 1301–1438; the Little Tucker Act, 28 U.S.C. § 1346(a)(2);

the Back Pay Act, 5 U.S.C. § 5596; and the Declaratory Judgment Act, 28 U.S.C. § 2201.  <u>See</u>

Amended Complaint ("<u>Terry I</u> Am. Compl.") ¶¶ 1–3, <u>Terry v. Architect of the Capitol</u>, Civ.

Action No. 18-1733 ("<u>Terry I</u>"), ECF No. 31; Amended Complaint ("<u>Terry II</u> Am. Compl.")

¶¶ 1–3, <u>Terry v. Architect of the Capitol</u>, Civ. Action No. 18-2585 ("<u>Terry II</u>"), ECF No. 9.

Currently pending before the Court is the defendant's partial motion to dismiss.  <u>See generally</u>

Defendant's Partial Motion to Dismiss ("Def.'s Mot." or the "defendant's motion"), ECF No. 32.[1]  Upon careful consideration of the parties' submissions and the entire record in this case,[2] the Court concludes for the following reasons that it must grant the defendant's motion.

## I.    BACKGROUND

### A.    The Plaintiff's Employment

Unless otherwise specified, the following allegations are taken from the plaintiff's <u>Terry I</u> and <u>Terry II</u> Amended Complaints.  <u>See</u> <u>Terry I</u> Am. Compl; <u>Terry II</u> Am. Compl.  The plaintiff "was employed as a WG-9 [p]ainter" in the defendant's "House Office Buildings Jurisdiction." <u>Terry I</u> Am. Compl. ¶ 17.  He "regularly worked the night shift," and "[b]eginning in approximately January 2018, [he] was regularly required to either abate lead paint without proper safety equipment and[] precautions or [ ] work in close proximity to other [ ] employees who [were] abating lead paint without proper safety equipment and[] safety precautions." <u>Id.</u> ¶¶ 18–19.  On February 6, 2018, the plaintiff "filed a workplace safety complaint at the [defendant's] Office of Compliance[.]" <u>Id.</u> ¶ 23.  "On February 12, 2018[,] the Office of Compliance's Occupational Safety and Health Specialists, among others, met with Superintendent Weidemeyer, [Assistant] Superintendent Ryan Columbo, and Safety Specialist David Hicks, as well as other employees of the [defendant], including an attorney from the Office of General Counsel." <u>Id.</u> ¶ 25.  Following the filing of the plaintiff's workplace safety complaint, the

---

[1] On March 25, 2019, the Court consolidated <u>Terry I</u> and <u>Terry II</u>, and ordered that "the parties shall make all future filings only in [<u>Terry I</u>,] Case No. 18-cv-1733[.]"  Order at 1 (Mar. 25, 2019), <u>Terry I</u>, ECF No. 18.  Therefore, unless otherwise specified, any filing identified in this Memorandum Opinion was made in <u>Terry I</u>.

[2] In addition to the filings already identified, the Court considered the following submissions and accompanying exhibits in rendering its decision: (1) the Defendant's Memorandum in Support of Partial Motion to Dismiss ("Def.'s Mem."), ECF No. 32-1; (2) the plaintiff's opposition to the defendant's motion to dismiss, which was submitted without any title ("Pl.'s Opp'n"), ECF No. 34; (3) the Defendant's Reply in Support of Partial Motion to Dismiss ("Def.'s Reply"), ECF No. 35; (4) the Defendant's Supplemental Briefing in Support of Partial Motion to Dismiss ("Def.'s Suppl. Br."), ECF No. 37; and (5) the Plaintiff's Supplemental Brief in Opposition to Partial Motion to Dismiss ("Pl.'s Suppl. Br."), ECF No. 38.

defendant "produced documents that allegedly explained the applicable lead abatement rules and procedures[,]" however, "those procedures were not being followed and the [p]ainters were not being supervised by individuals who were experienced with lead abatement." Id. ¶ 26. Following an investigation, "the Occupational Safety and Health Specialists found several safety deficiencies" regarding the defendant's treatment of lead abatement. Id. ¶ 28; see id. ¶¶ 29–30. "[I]n February 2018, [the plaintiff] asked . . . [Safety Officer] Andrew Reed . . . for a full-face proper respirator[,]" but "Reed stated that [the plaintiff] did not require a proper respirator for the work he was performing." Id. ¶ 31.

On March 13, 2018, Alan Redkey,[3] the assistant night-shift supervisor, see Terry II Am. Compl. ¶ 23, "falsely claimed that [the plaintiff] had spilled or splattered paint on the carpet of the room where he had been painting[,]" but when the plaintiff "asked Redkey to show him the paint, [ ] Redkey was unable to do so[,]" id. ¶ 32.  "On or about March 17, 2018, [the plaintiff] complained, during a shop meeting, that [ ] Redkey had instructed him to sand a door that was painted with lead paint, without a respirator[,] [ ] contrary to the [defendant's] new lead paint abatement protocols." Id. ¶ 33.  On March 20, 2018, the "[p]laintiff initiated his first claim of retaliation against the [defendant] by filing a request for counseling with the Office of Compliance." Terry II Am. Compl. ¶ 25.  On April 15, 2018, the plaintiff "submitted a formal statement to his supervisors, including his safety complaints about having to sand down the door without proper [p]ersonal [p]rotective [e]quipment." Terry I Am. Compl. ¶ 34.  On that same day, the "[n]ight [s]hift [s]upervisor, John (Kenny) Bucker[,] told [the plaintiff] that Charles (Charlie) Bryan[, the s]hop foreman[,] had instructed [Bucker] not to speak to [the plaintiff]

---

[3] In the Terry II Amended Complaint, the plaintiff identifies this individual as "Assistant Night Shift Supervisor[] John (Alan) Radtke[.]" Terry II Am. Compl. ¶ 23.  For ease of reference, the Court will use the spelling contained in the Terry I Amended Complaint, and refer to this individual as "Alan Redkey[.]"

any[]more." Id. ¶ 36.  On April 16, 2018, "Reed accused [the plaintiff] of having lied about not

being given a proper respirator." Id. ¶ 37.  On April 17, 2018, the plaintiff "complained to

Gerald Owens[, a] work leader[,] about working adjacent to an employee who was abating lead

paint in violation of the [defendant's] safety protocols[,] i.e.[,] not wetting the area down, not

using glove bags to collect the lead paint[,] and not posting signs to warn the public of the

danger[]." Id. ¶ 35.  And "[o]n or about April 24, 2018[,] the day shift was assigned to work a

project on overtime hours[,]" when, "[u]nder normal circumstances, the overtime assignment

would have been shared between [the] day and night shift[s]." Id. ¶ 38.  "Redkey explained that

[the] day shift had been given the assignment because the project involved painting with 'special

colors,'" however, "the excuse was false[] because night[-]shift painters regularly used 'special

colors.'" Id.  Further, "in April [2018], [Redkey] abruptly stopped providing [the plaintiff] with

training on the [p]aint [s]hop tint machine, although he continued to give other painters training

on the machine." Terry II Am. Compl. ¶ 31.  Although the plaintiff "repeatedly asked [Redkey]

when he could continue the training," Redkey "told [the plaintiff] that they would pick up the

training 'later.'" Id.

On May 2, 2018, the plaintiff "asked . . . Redkey about a career ladder promotion to

WG[-]10 because he had the time in grade and was working at the next level." Terry I Am.

Compl. ¶ 40.  "On or about May 8, 2018, [the plaintiff] asked [ ] Columbo for permission to

change his . . . day off" from Friday, May 25, 2018, to Monday, May 28, 2018, but "Columbo

refused to permit [the plaintiff] to move his [ ] day [off], even though the shop had honored

similar requests on other occasions." Id. ¶ 39.  "On or about May 9, 2018," the plaintiff was

informed by Columbo that "no ladder promotion was possible[,] . . . contrary to past practice in

the [p]aint shop." Id. ¶ 40.  On May 11, 2018, the "[p]laintiff requested mediation in his then-

pending Office of Compliance complaint[.]" Terry II Am. Compl. ¶ 34.  On May 22, 2018, "one

of [the plaintiff's] co-workers expressed his displeasure toward [the plaintiff], saying that no one

could change their [ ] day off because 'someone' (with the implication that it was [the plaintiff])

had made a complaint about it, suggesting that [the d]efendant had altered its practice of

allowing changes to [ ] days [off] to cover up its retaliation against [the p]laintiff." Terry I Am.

Compl. ¶ 41.  Finally, "[o]n July 11, 2018[, the plaintiff] informed the Office of Compliance

Occupational Safety and Health Specialists that lead abatement work continued to be performed

in an unsafe manner." Id. ¶ 42. "Specifically, [the plaintiff] advised the Occupational Safety and

Health Specialists that large areas of the hallways in the Longworth Building were being abated

with no containment in place while the building was open to the public." Id.

On July 25, 2018, the plaintiff filed his Complaint in Terry I, see Complaint at 1, ECF

No. 1, which he later amended, see generally Terry I Am. Compl.  Thereafter, the "[p]laintiff's

supervisors continued to assign [him] to work in hazardous situations and conditions, and [ ]

Bucker continued his past practice of refusing to speak to [the p]laintiff about his safety

concerns." Terry II Am. Compl. ¶ 38.  "On numerous occasions between June and August 2018,

[Redkey] ignored [the p]laintiff's questions about safety and potential hazards during shop

meetings and when [Redkey] gave [the plaintiff] his assignments." Id. ¶ 39.  "On approximately

[twenty] occasions between June and August [2018], when the [p]aint [s]hop [f]oreman[, Dale

Crowl,] would encounter [the plaintiff] in the [p]ainter[s'] break room, he would declare that it

looked like [the plaintiff] had just woken up[.]" Id. ¶ 40.  The plaintiff "understood [Crowl's

actions] as a threat that Crowl would initiate an unfounded disciplinary action for allegedly

sleeping on the job, an offense for which employees [of] the [defendant] have been disciplined,

up to and including termination." Id. ¶ 40.  Moreover, "[t]hroughout this time period, the

[defendant] only paid [the p]laintiff his base rate of pay for his [eight]-hour Monday shift each week, even though the Monday shift actually commenced at 10[ p.m.] on Sunday" and, therefore, "entitled [the p]laintiff to [twenty-five percent] premium pay [("Sunday pay")] for the [ ] entire shift." Id. ¶ 41.  On December 17, 2018, the plaintiff filed his Complaint in Terry II, see Terry II Compl. at 1, which he later amended, see generally Terry II Am. Compl.; Notice of Filing Amended Complaint, Terry II, ECF No. 9-1.

**B.     The Plaintiff's Cases**

**1.   Terry I**

In his Terry I Amended Complaint, the plaintiff alleges that (1) the "[d]efendant retaliated against [him] for his protected workplace safety complaints, in violation of the [ ] Accountability Act, when it denied him overtime opportunities, rejected his request for a ladder promotion to WG-10[,] and denied his request to change his [ ] day off" ("Terry I Count I"), Terry I Am. Compl. ¶ 45; (2) the "[d]efendant imposed a retaliatory hostile work environment, in violation of the [ ] Accountability Act" ("Terry I Count II"), id. ¶ 49; (3) the defendant "never paid [the p]laintiff the environmental hazard pay to which he was entitled on either regular time or overtime" ("Terry I Count III"), id. ¶ 55; and (4) the plaintiff's "regular[] work[] in close proximity to toxic substances" merits a "[d]eclaratory [j]udgment that he was entitled to the environmental hazard differential pay of [eight percent] to be included in his [b]ase [r]ate of [p]ay" ("Terry I Count IV"),[4] id. ¶ 58.

---

[4] The plaintiff's Terry I Amended Complaint refers to this claim, titled "Declaratory Relief and Backpay[,]" as "Count III[,]" although it is, sequentially, the fourth count in the Terry I Amended Complaint, and follows the plaintiff's "Wage Theft" claim, which is also titled as "Count III[.]"  Compare Terry I Am. Compl. ¶¶ 52–56, with id. ¶¶ 57–60.  For ease of reference, the Court, like the defendant, see Def.'s Mem. at 1 n.1, will refer to the plaintiff's "Declaratory Relief and Backpay" claim as "Count IV" in this Memorandum Opinion and the accompanying Order.

**2. <u>Terry II</u>**

In his <u>Terry II</u> Amended Complaint, the plaintiff alleges that (1) he "was constructively discharged from his position" due to "the hostile work environment that the [defendant] imposed[,]" ("<u>Terry II</u> Count I"), <u>Terry II</u> Am. Compl. ¶ 45; (2) the defendant retaliated against him by "fail[ing] to pay the [p]ainters a [twenty-five percent] premium pay differential[,]" ("<u>Terry II</u> Count II"), <u>id.</u> ¶ 49; and (3) he "is entitled to his lost wages because of the [defendant's] failure to pay him his [twenty-five percent Sunday] pay[,]" ("<u>Terry II</u> Count III"), <u>id.</u> ¶ 55. On March 4, 2019, the defendant filed its answer to the plaintiff's <u>Terry II</u> Amended Complaint. <u>See</u> Answers and Defenses, <u>Terry II</u> ("<u>Terry II</u> Answer and Defenses") at 1, ECF No. 11.

**3. Consolidation**

On March 25, 2019, the Court consolidated <u>Terry I</u> and <u>Terry II</u>. <u>See</u> Order at 1 (Mar. 25, 2019), ECF No. 18. The defendant then filed its motion for partial judgment on the pleadings, arguing that the "[p]laintiff cannot establish that this Court has jurisdiction over the issues of environmental differential pay or premium pay." Defendant's Motion for Partial Judgment on the Pleadings ("Def.'s Mot. for Partial Judgment on the Pleadings" or the "defendant's motion for partial judgment on the pleadings") at 8,[5] ECF No. 21. On January 30, 2020, the Court denied the defendant's motion for partial judgment on the pleadings without prejudice "pending the Court's resolution of the plaintiff's forthcoming motion for leave to amend his complaints" in <u>Terry I</u> and <u>Terry II</u>. Order at 1 (Jan. 30, 2020), ECF No. 25.

---

[5] Because the defendant's motion for partial judgment on the pleadings did not contain page numbers, the page numbers cited by the Court when referring to this motion are the page numbers automatically generated by the Court's ECF system.

On March 26, 2020, the plaintiff moved for leave to file an Amended Complaint in Terry I, which would "add factual detail to the [Terry I C]omplaint supporting [the p]laintiff's claim that he was not compensated at the correct rate of pay for overtime work, during which time he was performing work under hazardous conditions that qualified him for environmental hazard pay." Plaintiff's Motion for Leave to File First Amended Complaint at 1, ECF No. 27; see also Defendant's Response to Plaintiff's Motion for Leave to Amend at 2, ECF No. 29 (stating that the "[d]efendant will not oppose the filing of [the p]laintiff's proposed Amended Complaint, but intends to move to dismiss the Amended Complaint"). On May 29, 2020, the Court granted the plaintiff's motion for leave to amend. See Min. Order (May 29, 2020).

### 4.  The Defendant's Partial Motion to Dismiss

On June 26, 2020, the defendant filed the partial motion to dismiss that is the subject of this Memorandum Opinion, see Def.'s Mot. at 1, which the plaintiff opposes, see Pl.'s Opp'n at 1. Following a hearing before the Court, the Court ordered the parties to file supplemental briefing addressing "(1) whether a requirement exists that an employee of the defendant pursue the defendant's grievance process in order for environmental hazard pay to [be] included in his or her regular rate of pay; and (2) how the regular rate of pay of an employee of the defendant is determined." Order at 1 (Feb. 26, 2021), ECF No. 36. Thereafter, the parties filed their supplemental briefs. See generally Def.'s Suppl. Br.; Pl.'s Suppl. Br.

## II.      STANDARD OF REVIEW

Federal district courts are courts of limited jurisdiction, Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994), and therefore, "[a] motion for dismissal under [Federal Rule of Civil Procedure] 12(b)(1) 'presents a threshold challenge to the [C]ourt's jurisdiction[.]'" Morrow v. United States, 723 F. Supp. 2d 71, 75 (D.D.C. 2010) (Walton, J.) (quoting Haase v. Sessions, 835 F.2d 902, 906 (D.C. Cir. 1987)). Thus, the Court is obligated to dismiss a claim if

it "lack[s] [ ] subject-matter jurisdiction[.]" Fed. R. Civ. P. 12(b)(1).  And, because "[i]t is to be

presumed that a cause lies outside [ ] [the Court's] limited jurisdiction," Kokkonen, 511 U.S. at

377, "the plaintiff bears the burden of pro[ving]" that the Court has jurisdiction over the

plaintiff's claims, Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992).

 In deciding a motion to dismiss based upon lack of subject-matter jurisdiction, the Court

"need not limit itself to the allegations of the complaint."  Grand Lodge of the Fraternal Order of

Police v. Ashcroft, 185 F. Supp. 2d 9, 14 (D.D.C. 2001).  Rather, the "[C]ourt may consider such

materials outside the pleadings as it deems appropriate to resolve the question [of] whether it has

jurisdiction to hear the case."  Scolaro v. D.C. Bd. of Elections & Ethics, 104 F. Supp. 2d 18, 22

(D.D.C. 2000); see also Jerome Stevens Pharms., Inc. v. Food & Drug Admin., 402 F.3d 1249,

1253 (D.C. Cir. 2005).  Additionally, the Court must "assume the truth of all material factual

allegations in the complaint and 'construe the complaint liberally, granting [the] plaintiff the

benefit of all inferences that can be derived from the facts alleged[.]'"  Am. Nat'l Ins. Co. v. Fed.

Deposit Ins. Corp., 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting Thomas v. Principi, 394 F.3d

970, 972 (D.C. Cir. 2005)).  However, "the [p]laintiff's factual allegations in the complaint . . .

will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for

failure to state a claim."  Grand Lodge, 185 F. Supp. 2d at 13–14 (alterations in original)

(internal quotation marks omitted).

## III. ANALYSIS

 The defendant moves to dismiss Counts III and IV of the Terry I Amended Complaint for

lack of subject-matter jurisdiction because (1) "[t]he United States has not waived sovereign

immunity as to the [defendant's] administration of its policies regarding application of

environmental differential pay[,]" and therefore, as to Count III, the Court lacks "jurisdiction to

determine whether the [eight percent] environmental differential should have been included in the regular rate used to calculate any overtime that might have been owed to [the plaintiff;]" and (2) as to Count IV, "the Court does not have jurisdiction under any other law, including the [Declaratory Judgment Act or the] Back Pay Act, to grant the declaratory relief sought in Count IV[.]" Def.'s Mem. at 5.  The defendant also moves to dismiss Count III of the <u>Terry II</u> Amended Complaint for lack of subject-matter jurisdiction "because the Little Tucker Act does not independently confer jurisdiction[,]" <u>id.</u>, over the plaintiff's claim that he was entitled to "Sunday [ ] pay[,]" <u>id.</u> at 2.  In response, the plaintiff argues that the Court has jurisdiction over both Counts III and IV of the <u>Terry I</u> Amended Complaint, <u>see</u> Pl.'s Opp'n at 7, and Count III of the <u>Terry II</u> Amended Complaint, <u>see id.</u> at 15.  The Court will address each count in turn.

## A.     Count III of the <u>Terry I</u> Amended Complaint

In Count III of the <u>Terry I</u> Amended Complaint, the plaintiff alleges that the defendant violated the Accountability Act by failing to pay the plaintiff environmental hazard pay as part of his regular and overtime wages.  <u>See</u> <u>Terry I</u> Am. Compl. ¶¶ 53–56.  The defendant seeks to dismiss this count because the Court lacks subject-matter jurisdiction, arguing that "the United States has not waived sovereign immunity through the [Accountability Act] as to the [defendant's] determination of the applicability of environmental differential pay."  Def.'s Mem. at 6.  The plaintiff responds that "[a] determination that [he] is entitled to [ ] environmental hazard pay is well within this Court's authority under the [Accountability Act]."  Pl.'s Opp'n at 8–9.  For the following reasons, the Court agrees with the defendant.

A court's "obligation to assure [itself that it has] jurisdiction extends to sovereign immunity because it is jurisdictional[.]"  <u>Perry Cap. LLC v. Mnuchin</u>, 864 F.3d 591, 621 (D.C.

Cir. 2017) (citation omitted).[6]  "It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." Anderson v. Carter, 802 F.3d 4, 8 (D.C. Cir. 2015) (quoting United States v. Mitchell, 463 U.S. 206, 212 (1983)). Moreover, a court is obligated to "strictly construe[]" a waiver of sovereign immunity "in favor of the sovereign." Lane v. Pena, 518 U.S. 187, 192 (1996).  Accordingly, "[a] waiver of the [f]ederal [g]overnment's sovereign immunity must be unequivocally expressed in statutory text, and will not be implied[.]" Id. (citation omitted).

### 1. Whether the Enactment of the Accountability Act Constitutes a Waiver of Sovereign Immunity as to Count III

The parties dispute whether the enactment of the Accountability Act constitutes a waiver of sovereign immunity as to Count III. See Def.'s Mem. at 12 (arguing that "neither the [Accountability Act] nor any other law has waived sovereign immunity to allow review of the [defendant's] application of th[e environmental hazard pay] policy"); Pl.'s Opp'n at 8 (arguing that "a claim that the [defendant] failed to pay [the p]laintiff overtime wages at the appropriate 'regular rate' . . . is cognizable under the [Accountability Act]").

---

[6] The plaintiff argues that the defendant is actually presenting an argument under Federal Rule of Civil Procedure 12(b)(6), rather than Rule 12(b)(1), because the defendant "is plainly arguing that [the plaintiff] cannot state a cognizable claim under the [Accountability Act] for unpaid overtime wages, as calculated to include environmental hazard pay[,] because another law[—the Architect of the Capitol Human Resources Act, 2 U.S.C. § 1831 ("the Architect HR Act")—]governs the [defendant's] personnel-related policies[.]" Pl.'s Opp'n at 6.  Therefore, the plaintiff argues, the "[d]efendant's argument should [ ] be considered under the 'failure to state a claim on which relief can be granted' standard found in Rule 12(b)(6)." Id.  Moreover, the plaintiff argues, the "[d]efendant has now twice used [the] incorrect position [that it is moving under Rule 12(b)(1)] to insert its motions to dismiss in untimely fashion in light of the fact that a motion to dismiss pursuant to Rule 12(b)(1) can be raised at any time." Id. at 5 (footnote omitted).  The Court disagrees, because as the defendant correctly notes in its reply, see Def.'s Reply at 5 n.7 & 5–6, its argument concerns whether it, as part of the United States, has waived its sovereign immunity from the plaintiff's claims.  See Def.'s Mem. at 5–6.  And, the Court has an "obligation to assure [itself that it has] jurisdiction[,]" and this obligation "extends to sovereign immunity because it is jurisdictional[.]" Perry Cap. LLC v. Mnuchin, 864 F.3d 591, 621 (D.C. Cir. 2017).  Accordingly, the defendant is permitted to bring its motion seeking dismissal for lack of subject-matter jurisdiction at any time.  See Fed. R. Civ. P. 12(h)(3) (stating that "[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action" (emphasis added)).

The Accountability Act "confers on [legislative] employees rights and remedies drawn from various labor and employment statutes not previously applicable to the legislative branch[,]" Fields v. Off. of Eddie Bernice Johnson, 459 F.3d 1, 5 (D.C. Cir. 2006), including "certain provisions of the Fair Labor Standards Act" ("FLSA"), id. at 46 n.25.  See 2 U.S.C. § 1313(a)(1) (applying by reference "subsections (a)(1) and (d) of [§] 6, [§] 7, and [§] 12(c) of the [FLSA]").  These FLSA provisions (1) mandate a minimum wage of "$7.25 an hour," 29 U.S.C. § 206(a)(1)(C); (2) prohibit sex discrimination, see id. § 206(d); (3) require compensation "for a workweek longer than forty hours . . . at a rate not less than [1.5] times the regular rate at which [the employee] is employed[,]" id. § 207(a)(1); and (4) prohibit "oppressive child labor[,]" id. § 212(c).  Moreover, these rights are enforceable in federal district courts.  See 2 U.S.C. § 1408(a) (providing that "[t]he district courts of the United States shall have jurisdiction over any civil action commenced under [§] 1401 of this title and this section by a covered employee").  Therefore, as to these four specific areas, the Accountability Act represents a limited waiver of the defendant's sovereign immunity as part of the legislative branch.

Because the Accountability Act does not explicitly waive sovereign immunity regarding claims of entitlement to environmental hazard pay,[7] the plaintiff argues that Count III falls under

---

[7] As the defendant correctly notes, see Def.'s Mem. at 7, the Accountability Act itself does not explicitly address environmental hazard pay, see 2 U.S.C. §§ 1301–1438, and none of the subsections of the FLSA that are incorporated in the Accountability Act explicitly require the payment of environmental hazard pay, see 29 U.S.C. §§ 206(a)(1) and (d), 207, 212(c).  Therefore, because "waiver[s] of the [f]ederal [g]overnment's sovereign immunity must be unequivocally expressed in statutory text," Lane, 518 U.S. at 192, the Accountability Act cannot operate as a waiver of sovereign immunity over a claim, like Count III, regarding an alleged entitlement to environmental hazard pay.

Rather, for employees of the defendant, like the plaintiff, the applicability of environmental hazard pay is determined by the defendant's "Human Resources Management Manual Chapter 532, Pay Under the Architect's Wage System" ("the defendant's pay policy").  See Pl.'s Opp'n, Exhibit ("Ex.") 2 (Order of the Architect of the Capitol (Mar. 1, 2005) ("Def.'s Pay Pol'y")); Pl.'s Opp'n at 8 (arguing that the defendant's pay policy "define[s] an employee's ['regular rate' of pay] as 'the scheduled rate of pay plus any applicable night[-]shift or environmental differential[,]' . . . which corresponds to the FLSA's requirement that an employee be paid 1.5 times 'the regular rate at which he [or she] is employed").  The Supreme Court has clearly held that "[a] waiver of the [f]ederal

(continued . . .)

the Accountability Act's incorporation of 29 U.S.C. § 207(a)(1), which mandates compensation "for a workweek longer than forty hours . . . at a rate not less than [1.5] times the regular rate at which [the employee] is employed[,]" 29 U.S.C. § 207(a)(1); see Pl.'s Opp'n at 7–12.  In Count III, the plaintiff alleges that "the [defendant] never calculated [his "regular rate" of pay[8]] to include the [eight percent] environmental hazard pay premium to which he is entitled, [and] consequently the failure to calculate [the plaintiff's] overtime rate of pay to include the [eight percent] hazard pay premium violated the [ ] Accountability Act."  Terry I Am. Compl. at 1–2; see also id. ¶¶ 53–56 (alleging that the plaintiff (1) "regularly works in close proximity to toxic substances" and therefore "was entitled to an environmental hazard differential pay of [eight percent] to be included in his ['regular r]ate['] of [p]ay, including when he works overtime[;]" (2) "worked overtime, performing hazardous work[]" and (3) was never paid "the environmental hazard pay to which he [was] entitled on either regular time or overtime").  According to the plaintiff, because the Accountability Act permits a plaintiff to sue for a failure to pay an

---

(. . . continued)

[g]overnment's sovereign immunity must be unequivocally expressed in statutory text[.]"  Lane, 518 U.S. at 192 (emphasis added).  Therefore, the defendant's internal pay policy does not constitute a waiver of sovereign immunity because it is not an "unequivocal[] . . . statutory text" intended to waive sovereign immunity.  Id.

Moreover, the Architect of the Capitol Human Resources Act (the "Architect HR Act"), 2 U.S.C. § 1831(c)(1), which directs the defendant to establish its pay policy, also does not waive sovereign immunity over claims regarding environmental hazard pay.  The Architect HR Act requires the defendant to "establish and maintain a personnel management system[.]"  2 U.S.C. § 1831(c)(1).  However, as the defendant correctly argues, see Def.'s Mem. at 11–12, the Architect HR Act itself does not mandate the payment of environmental hazard pay, and, furthermore, contains no waiver of sovereign immunity permitting legislative employees to pursue claims in court for alleged violations of the Architect HR Act—or any part of the "personnel management system[,]" including the defendant's pay policy, established in accordance with the Architect HR Act, see 2 U.S.C. § 1831(c)(1).  In sum, no explicit statutory waiver of sovereign immunity exists in either the Accountability Act, the FLSA, the defendant's pay policy, or the Architect HR Act, that permits the Court "to review the [defendant's] application of its [own pay] polic[y] regarding when environmental differential pay is due to workers[,]" Def.'s Mem. at 6.

[8] The parties use inconsistent terminology in referring to the amount of pay that the plaintiff received while working his regular hours.  See, e.g., Def.'s Mem. at 11 (the plaintiff's "regular rate"); Def.'s Suppl. Br. at 6 (the plaintiff's "basic rate of pay"); id., Ex. 6 (Declaration of Tanisha Gordon ("Gordon Decl.")) ¶ 3 (the plaintiff's "basic pay"); Terry I Am. Compl. at 1 (the plaintiff's "[r]ate of [b]asic [p]ay").  For ease of reference, the Court will refer to the rate at which the plaintiff was paid when not working overtime as his "regular rate" of pay, in accordance with the statutory language in 29 U.S.C. § 207(a)(1).

employee overtime wages at a minimum of 1.5 times the employee's regular rate of pay, "[i]t seems, therefore[,] an elementary matter that in the course of enforcing [the p]laintiff's right to receive overtime calculated at 1.5 times the [p]laintiff's [']regular rate[']" of pay, "the Court is free to examine and declare what the 'regular rate['] of pay[] should be so that the [p]laintiff may be paid the appropriate rate."  Pl.'s Opp'n at 8.  The Court disagrees.

Because "[a] waiver of the [f]ederal [g]overnment's sovereign immunity must be unequivocally expressed in statutory text, and will not be implied[,]" Lane, 518 U.S. at 192 (citation omitted), the Court begins its analysis with the applicable statutory text.  The Accountability Act states that "[t]he rights and protections established by . . . [§] 7 . . . of the [FLSA,]" 2 U.S.C. § 1313(a)(1)—which mandates compensation "for a workweek longer than forty hours . . . at a rate not less than [1.5] times the regular rate at which [the employee] is employed[,]" 29 U.S.C. § 207(a)(1)—"shall apply to covered employees[,]" 2 U.S.C. § 1313(a)(1).  Therefore, under the Accountability Act, a court has jurisdiction to review whether, "for a workweek longer than forty hours[,]" a legislative employee was paid "at a rate not less than [1.5] times the regular rate at which [he or she] is employed." 29 U.S.C. § 207(a)(1).  When "strictly construed," Lane, 518 U.S. at 192, this waiver applies to questions regarding the difference in the rate of pay between a plaintiff's "regular rate" of pay and his or her overtime rate of pay.

Here, as the defendant correctly argues, see Def.'s Mem. at 6 (arguing that "[alt]hough [the p]laintiff has attempted to dress his claims up as being ones for unpaid overtime, he is actually asking this Court to review the regular rate upon which any applicable overtime would be calculated"), Count III concerns whether the defendant appropriately withheld environmental differential pay from the plaintiff's "regular rate" of pay, see Terry I Am. Compl. ¶ 53 ("[d]ue to

the fact that [the p]laintiff regularly works in close proximity to toxic substances . . . , [he] was entitled to an environmental hazard differential pay of [eight percent] to be included in his ['regular rate'] of [p]ay, including when he works overtime"); id. ¶ 55 (alleging that the defendant "never paid [the p]laintiff the environmental hazard pay to which he was entitled on either regular time or overtime").   Contrary to the plaintiff's arguments, see Pl.'s Opp'n at 7 (describing Count III as the "[p]laintiff's claim for incorrectly calculated overtime"), Count III does not concern whether the plaintiff's overtime pay was 1.5 times the "regular rate" of pay that he received.  See Terry I Am. Compl. ¶¶ 52–56.  Accordingly, the Court's review of Count III would amount to review of "whether the [plaintiff] is entitled to hazard pay in the first instance[,]" Pl.'s Opp'n at 10—a question that asks whether the plaintiff's "regular rate" of pay was correct based on the defendant's pay policy.[9]  But, as discussed above, see supra note 7, at 12–13, the defendant's pay policy cannot waive sovereign immunity, and accordingly, there is no statutory waiver of sovereign immunity over claims stemming from the defendant's pay policy.[10]  The mere fact that a plaintiff would have to establish facts regarding the amount of his or her "regular rate" of pay does not mean that the Court is permitted to sweep into its analysis any internal policies or legal issues for which a waiver of sovereign immunity is not "unequivocally

---

[9] The plaintiff makes no argument that any other source apart from the defendant's pay policy entitles him to environmental hazard pay.  See, e.g., Pl.'s Opp'n at 8 (arguing that the defendant "has established a policy that allows for environmental [hazard] pay to be paid to its employees under appropriate circumstances" and that "the [defendant's pay policy] define[s] an employee's 'Rate of Basic Pay' as 'the scheduled rate of pay plus any applicable night shift or environmental differential'").

[10] There is no dispute between the parties that "if [the p]laintiff had received environmental differential pay, it would have been included in his ['regular] rate['] of pay, and [any] failure by [the d]efendant to include it in its overtime calculation would be in violation of [the] FLSA."  Def.'s Suppl. Br. at 7.  However, the plaintiff alleges that the defendant "never paid [him] the environmental hazard pay to which he was entitled on either regular time or overtime."  Terry I Am. Compl. ¶ 55.  Therefore, the fact that this Court would be able to hear the plaintiff's claim that he did not receive the correct amount of overtime pay if he had received environmental differential pay as part of his "regular rate" of pay does not conflict with the Court's conclusion that it lacks jurisdiction over this case as alleged by the plaintiff.

expressed" in the statutory text, <u>Lane</u>, 518 U.S. at 192.  Accordingly, the Court concludes that

sovereign immunity of the claim asserted in Count III has not been waived, and the Court

therefore lacks jurisdiction over this claim.

### 2. The Plaintiff's Counter-Arguments

In response to the defendant's arguments, the plaintiff raises several counter-arguments.[11]

First, he argues that the defendant's "position would create an impossible, circular argument"

---

[11] In addition to the arguments discussed below, the plaintiff cites two authorities for his argument that "[a] determination that [he] is entitled to [ ] environmental hazard pay is well within this Court's authority under the [Accountability Act,]" Pl.'s Opp'n at 8–9.  First, he argues that the Court has jurisdiction over this question because "questions ancillary to, or growing out of, the main action . . . may be taken cognizance of by the [C]ourt and determined, since such jurisdiction is in aid of its authority over the principal matter[.]" <u>Id.</u> at 9 (first alteration in original) (quoting <u>Am. Iron & Steel Inst. v. Envtl. Prot. Agency</u>, 115 F.3d 979, 986 (D.C. Cir. 1997)).  In <u>American Iron & Steel Institute</u>, the District of Columbia Circuit held that it had ancillary jurisdiction to review parts of an agency regulation, the Final Water Quality Guidance for the Great Lakes System, 60 Fed. Reg. 15,366 (Mar. 23, 1995), that were otherwise not within the Circuit's direct jurisdiction because "[t]he magnitude and technical character of the record . . . strongly militates against splitting the case into pieces[,]" "[t]he interest in assuring a forum capable of treating the case coherently might justify the comparatively modest displacement of the district court[,]" and "national uniformity, an important goal in dealing with broad regulations, is best served by initial review in a court of appeals."  <u>Id.</u> (citations, internal quotation marks, and alternations omitted).  Accordingly, the Circuit concluded that "[s]ince most of the case is within [its] direct jurisdiction, [it could] properly assert ancillary jurisdiction over the remainder."  <u>Id.</u>

None of the Circuit's reasons in <u>American Iron & Steel Institute</u> are applicable to this case, however.  First, the jurisdictional issues presented here do not concern whether to "split[] the case into pieces[,]" <u>id.</u>, because the question is whether <u>any</u> court—including this Court—would have jurisdiction over Count III, not whether initial review is proper in a Court of Appeals, or even whether another court should address part of Count III.  See <u>Morrow v. District of Columbia</u>, 417 F.2d 728, 738 (D.C. Cir. 1969) (noting that, if ancillary jurisdiction did not exist, "parties would be forced to go to different courts to obtain complete relief").  Moreover, as discussed above, "most of" Count III does not fall "within [the Court's] direct jurisdiction[,]" <u>Am. Iron & Steel Inst.</u>, 115 F.3d at 986, because Count III concerns whether the plaintiff's "regular rate" of pay was correct according to the defendant's pay policy, not to whether the plaintiff's overtime pay was at least 1.5 times the "regular rate" of the pay that he received.  Therefore, "most of[,]" <u>id.</u>, Count III does not relate to the question over which this Court would have jurisdiction, i.e., the difference in rates between the plaintiff's overtime and regular pay.  Finally—and most importantly—the plaintiff does not cite, and the Court is unable to find, any case holding that ancillary jurisdiction may be used to extend the Court's jurisdiction to include a claim for which the government has not waived its sovereign immunity.  See generally Pl.'s Opp'n.  Accordingly, the plaintiff's reliance on <u>American Iron & Steel</u> is misplaced.

Second, in his supplemental brief, the plaintiff argues for the first time that "the broad remedial intent of the FLSA" grants the Court "authority and jurisdiction" to determine "whether [he] is entitled to environmental differential pay to be included in his ['regular rate['] of pay . . . in the course of deciding [his] [ ] claim[ under the Accountability Act]."  Pl.'s Suppl. Br. at 7.  The plaintiff cites <u>Rhea Lana, Inc. v. United States Department of Labor</u>, 271 F. Supp. 3d 284 (D.D.C. 2017), for the proposition that "Congress intended for [the] FLSA's protections to be interpreted broadly in favor of workers' rights[,]" <u>id.</u> at 289.  However, he fails to note that this quotation summarized an argument made by a party in that case and was not a statement—let alone a holding—of the court.  See id. ("[T]he

(continued . . .)

whereby "[n]o court could ever determine an employee's challenge over whether or not he is being paid 1.5 times his appropriate 'regular rate' of pay" when working overtime because courts could not evaluate "what elements are required . . . to be included in [that employee's ']regular rate['] of pay." Pl.'s Opp'n at 10. This is incorrect, but this reality has no bearing on the Court's ruling. The Court would have jurisdiction to review a claim that the Accountability Act exempted from the protection of sovereign immunity—namely, a claim that the employee was not paid at least 1.5 times his or her "regular rate" of pay when working overtime. For example, if a hypothetical plaintiff earned fifteen dollars per hour as his or her "regular rate" of pay, then a court is authorized to review whether he or she earned at least 1.5 times that amount when working overtime. However, a court would not have jurisdiction to review claims challenging the validity of his or her fifteen-dollar-per-hour "regular rate" of pay under any authority for which there is not a clear waiver of sovereign immunity. See Lane, 518 U.S. at 192 (noting that "[a] waiver of the [f]ederal [g]overnment's sovereign immunity must be unequivocally expressed in statutory text").

Second, the plaintiff argues that the defendant's construction of the Accountability Act would permit the defendant to "simply flout the overtime pay requirements of the [Accountability Act.]" Pl.'s Opp'n at 10. To illustrate, the plaintiff provides two hypotheticals: (1) "the [defendant] could attempt to reduce its overtime expenses by calculating all GS-13 employees' overtime wages based on a GS-9 rate of pay[,]" and (2) "the [defendant] could

---

(. . . continued)

[defendant] Department [of Labor] points to the following factors that support its [ ] determination [that the plaintiff's volunteers qualified as employees under the FLSA]: . . . Congress intended for [the] FLSA's protections to be interpreted broadly in favor of workers' rights."). Even assuming that the Court agreed with the Department of Labor's argument in that case, a broad interpretation of workers' rights under the FLSA would pertain to questions on the merits, rather than the preliminary, jurisdictional question of whether the United States has waived sovereign immunity regarding this issue. Any obligation to construe rights under the FLSA broadly cannot nullify the Court's obligation to "strictly construe[]" a waiver of sovereign immunity "in favor of the sovereign." Lane, 518 U.S. at 192.

exclude night[-]shift differential payments from all employees' overtime calculations."  Id.
However, neither hypothetical supports the plaintiff's argument because, in both hypothetical
situations, the defendant would not be calculating overtime payments based on the employee's
"regular rate" of pay.  To illustrate, in the first hypothetical, the GS-13 employee's "regular rate"
of pay would be at a GS-13 level.  Accordingly, if the employee only received overtime
payments at 1.5 times the GS-9 rate, the employee would not have received overtime at 1.5 times
his or her "regular rate."  Therefore, a court would have jurisdiction to consider a claim that the
employee's overtime pay was not 1.5 times of his or her "regular rate" of pay.  Similarly, in the
second hypothetical, if an employee received night-shift differential payments as part of his or
her "regular rate" of pay, but did not receive night-shift differential payments as part of his or her
overtime pay, then his or her overtime pay would not be 1.5 times of his or her "regular rate" of
pay.  Accordingly, a court would be able to review a claim under the Accountability Act alleging
that the employee's overtime pay did not reflect 1.5 times his or her "regular rate" of pay.
Therefore, neither hypothetical supports the plaintiff's argument that the Court has jurisdiction
over Count III.[12]

The Court is not unsympathetic to the plaintiff's concerns regarding the inability to
obtain judicial review over claims as asserted in Count III, however, this unfortunate result does

---

[12] The plaintiff also cites two cases where district courts that were not addressing the question of jurisdiction held
that similar claims regarding inaccurate "regular rates" of pay presented as overtime claims under the FLSA were
barred by collective bargaining agreements.  See Pl.'s Opp'n at 11 (discussing Hoops v. Keyspan Energy, 822 F.
Supp. 2d 301, 307 (E.D.N.Y. 2011), and Elswick v. Daniels Elec., Inc., 787 F. Supp. 2d 443 (S.D. W. Va. 2011)).
However, as the defendant correctly notes in its reply, "[b]oth of these non-controlling cases involved defendants
that were private entities, not subdivisions of the United States [g]overnment[,]" Def.'s Reply at 8 n.10.  Therefore,
these cases have nothing to do with whether the United States has waived subject-matter jurisdiction over
applications of the defendant's pay policy.

not mitigate the Court's obligation to strictly construe waivers of sovereign immunity.[13]

Accordingly, because "the sole basis alleged for [Count III] is the [defendant's] alleged failure to

include the [eight percent] environmental differential in the [']regular rate['] upon which any

overtime owed to [the p]laintiff must be calculated" and the plaintiff has "not otherwise alleged

that he was not paid 1.5 times his [']regular rate['] for hours [ ] worked in excess of forty hours

in any given week[,]" Def.'s Reply at 4, the Court concludes that it does not have subject-matter

jurisdiction over Count III.  The Court must therefore dismiss Count III of the plaintiff's <u>Terry I</u>

Amended Complaint for lack of jurisdiction.[14]

**B.      Count IV of the <u>Terry I</u> Amended Complaint**

The Court next turns to the defendant's challenge to Count IV of the <u>Terry I</u> Amended

Complaint.  In Count IV, the plaintiff alleges that "[d]ue to the fact that [he] regularly worked in

close proximity to toxic substances . . . , [he] is entitled to a [d]eclaratory [j]udgment" pursuant

to the Declaratory Judgment Act, 28 U.S.C. § 2201, "that he was entitled to the environmental

hazard differential pay of [eight percent] to be included in his [']regular rate['] of [p]ay for all

hours that he work[ed] on regular time, in addition to overtime[,]" <u>Terry I</u> Am. Compl. ¶ 58, and

---

[13] As the defendant aptly notes in its supplemental brief, <u>see</u> Def.'s Suppl. Br. at 5–6, that, although "the United States has not waived sovereign immunity for a federal court to review the [defendant's] application of [its p]ay [p]olicy," <u>id.</u> at 6, there are administrative avenues available to the plaintiff, and other employees of the defendant, to pursue claims that the defendant has improperly applied its own pay policy, including a grievance procedure, <u>see generally id.</u>, Ex. 1 (Architect of the Capitol, Human Resources Manual, Ch. 771, Grievances).  In a declaration provided by the defendant, Assistant Superintendent Ryan Columbo attests that "employees have used the [defendant's g]rievance [p]olicy to grieve all manner of concerns relating to their employment, including concerns relating to letters of counseling or reprimands, disagreement with their direct supervisors on issues such as management style or decisions that affect assignments, and pay issues[,]" <u>id.</u>, Ex. 2 (Declaration of Ryan Columbo ("Columbo Decl.")) ¶ 2, including an "issue regarding the miscalculation of certain employees' Sunday differential pay[,]" <u>id.</u>, Ex. 2 (Columbo Decl.) ¶ 3.

[14] The plaintiff argues that the "[d]efendant has conceded. . . [t]hat 'the FLSA is silent regarding the subject of hazard pay, except to require that it be included as part of a federal employee's regular rate of pay in computing the employee's overtime pay[.]'"  Pl.'s Opp'n at 7–8 (emphasis omitted) (quoting Def.'s Mot. for Partial Judgment on the Pleadings at 7).  However, "parties may not waive or concede a federal court's subject[-]matter jurisdiction." <u>Gardner v. United States</u>, 211 F.3d 1305, 1310 (D.C. Cir. 2000).  Therefore, the defendant's statement in its earlier memorandum not only fails to comport with the legal authority the Court is required to follow, but also does not impact the Court's determination regarding the defendant's arguments in its partial motion to dismiss.

"to backpay . . . pursuant to [the Back Pay Act,] 5 U.S.C. § 5596[,]" id. ¶ 60.  As the defendant argued regarding Count III, the defendant seeks to dismiss Count IV because "th[e] Court does not have jurisdiction to provide [a] remedy" under either the Declaratory Judgment Act or the Back Pay Act.  Def.'s Mem. at 15.  For the following reasons, the Court concludes that there has been no waiver of sovereign immunity as to the allegations asserted in Count IV.

### 1.  The Declaratory Judgment Act

The plaintiff first argues that, "even if the Court did not have full authority[] under the [Accountability Act,]" Pl.'s Opp'n at 9, to determine whether the defendant's pay policy entitles him to environmental hazard pay, "the Declaratory Judgment Act gives this Court the authority to 'declare the rights and other legal relations' of [the plaintiff] with respect to his entitlement to environmental hazard pay[,]" id. (quoting 28 U.S.C. § 2201); see 28 U.S.C. § 2201(a) ("In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.").  However, the Court agrees with several of its colleagues that "the Declaratory Judgment Act does not provide a waiver of sovereign immunity."  Stone v. Dep't of Hous. & Urb. Dev., 859 F. Supp. 2d 59, 64 (D.D.C. 2012) (citing Walton v. Fed. Bureau of Prisons, 533 F. Supp. 2d 107, 114 (D.C. Cir. 2008)).  Therefore, because there has been no waiver of sovereign immunity over the question of whether the defendant's pay policy entitles the plaintiff to environmental hazard pay, the Declaratory Judgment Act does not confer to the Court jurisdiction over Count IV.

### 2.  The Back Pay Act

The plaintiff next argues that "[b]y the plain language of the Back Pay Act, it applies to [his] claim that he was not paid at 1.5 times his [']regular rate['] of pay for the overtime that he worked."  Pl.'s Opp'n at 13.  The Back Pay Act entitles back pay to

20

> [a]n employee of an agency who, on the basis of a timely appeal or an administrative determination . . . is found by appropriate authority under applicable law, rule, regulation, or collective bargaining agreement, to have been affected by an unjustified or unwarranted personnel action which has resulted in the withdrawal or reduction of all or part of the pay, allowances, or differentials of the employee[.]

5 U.S.C. § 5596(b)(1).  However, as discussed above, see supra note 7, at 12–13, the plaintiff's only alleged entitlement to environmental hazard pay stems from the defendant's pay policy, which is not a "law, rule, regulation, or collective bargaining agreement[.]"  Id.  Therefore, absent a waiver of sovereign immunity regarding the underlying claim for which the plaintiff seeks back pay pursuant to the Back Pay Act—namely, the application of the defendant's pay policy—the Back Pay Act itself does not provide the requisite clear and unambiguous waiver of sovereign immunity.[15]  See Davis v. Billington, 51 F. Supp. 3d 97, 111 (D.D.C. 2014) (Walton, J.) (concluding that "where Congress has, in one comprehensive, specific statute, . . . . chosen not to waive sovereign immunity for the plaintiff's claims, it would be illogical for the Court to find that another, more general statute, like the Back Pay Act, constitutes a waiver of sovereign immunity for the very same claims"); cf. Am. Fed. of Gov't Emps., Local 41, AFL-CIO v. Califano, 453 F. Supp. 550, 552 (D.C. Cir. 1978) (holding that the Back Pay Act is "not jurisdictional in character"); Gilbert v. Fed. Deposit Ins. Corp., 950 F. Supp. 1194, 1197 (D.D.C.

---

[15] In his supplemental brief, the plaintiff argues that the defendant's statement in its supplemental brief that it resolved employees' administrative grievances "by providing each affected employee full relief under the Back Pay Act[,]" Def.'s Suppl. Br. at 5, "is completely at odds with the [defendant's] prior statement that the Back Pay Act could not apply here because the [defendant's] human resources and pay policies could not be enforceable by way of the Back Pay [A]ct[,]" Pl.'s Suppl. Br. at 9.  As discussed above, a waiver of sovereign immunity must be clearly expressed in statutory text, see Lane, 518 U.S. at 192, therefore, the defendant's statement in its supplemental brief does not affect the Court's conclusion that the Back Pay Act does not waive sovereign immunity over the plaintiff's claim regarding the defendant's pay policy.  Furthermore, the Court sees no reason why an entity with sovereign immunity from judicial review would not be free to voluntarily conform its behavior to a law, even if the entity's compliance is not subject to judicial review.

1997) (holding that the Back Pay Act "does not create an alternative cause of action, rather it is an auxiliary measure that only operates at the relief stage").[16]

In sum, without an underlying claim over which the Court has subject-matter jurisdiction and for which sovereign immunity has been waived, the Declaratory Judgment Act and the Back Pay Act do not confer jurisdiction on the Court over the plaintiff's claim that the defendant's pay policy entitles him to environmental hazard pay.  Accordingly, the Court must dismiss Count IV of the plaintiff's Terry I Amended Complaint for lack of jurisdiction.

## C.    Count III of the Terry II Amended Complaint

In Count III of the Terry II Amended Complaint, the plaintiff alleges that the defendant "did not pay [him twenty-five percent Sunday] pay, and although the [defendant] has acknowledged that it owes [him] the backpay, it has not yet fully paid [him] those wages[,]" Terry II Am. Compl. ¶ 54, and therefore, he "is entitled to his lost wages because of the [defendant's] failure to pay him his [Sunday p]ay, in an amount that does not exceed $10,000 hazard pay, as well as liquidated damages[,]" id. ¶ 55.  The defendant "moves to dismiss Count III of the [Terry II] Amended Complaint[,]" which "purport[s] to state a claim for wage theft under the []Little[] Tucker Act[,]" Def.'s Mem. at 1, because "this Court does not have jurisdiction under the []Little[] Tucker Act to adjudicate [the p]laintiff's claim that he is entitled to Sunday [ ] pay[,]" id. at 2.

---

[16] The plaintiff argues that "the [District of Columbia] Circuit has interpreted the Back Pay Act to apply to FLSA claims[, ]specifically as a waiver of sovereign immunity for interest claims arising from a violation of the FLSA[.]" Pl.'s Opp'n at 13 (citing Soc. Sec. Admin., Balt., Md. v. Fed. Lab. Rels. Auth., 201 F.3d 465, 468 (D.C. Cir. 2000) ("We have recognized the Back Pay Act as a congressional waiver of sovereign immunity from interest claims on awards arising under other statutes, such as the FLSA.")).  However, the Circuit's opinion in Social Security Administration is inapposite here.  Count IV is neither an "interest claim[,]" nor a claim "arising under [an]other statute[,]" Soc. Sec. Admin., 201 F.3d at 468; see Terry I Am. Compl. ¶¶ 57–60, because no statute permits the Court to review the plaintiff's claim that the defendant failed to comply with its own pay policy, see supra note 7, at 12–13.  Therefore, Social Security Administration does not change the Court's conclusion that the United States has not waived sovereign immunity as to Count IV.

The Little Tucker Act provides that

[t]he district courts shall have original jurisdiction, concurrent with the United States Court of Federal Claims, of . . . [a]ny [ ] civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort[.]

28 U.S.C. § 1346(a)(2).  The Supreme Court has held that the Little Tucker Act—like its

companion statute, the Tucker Act—does not itself "creat[e] substantive rights, but [is] simply

[a] jurisdictional provision[] that operate[s] to waive sovereign immunity for claims premised on

other sources of law."  United States v. Bormes, 568 U.S. 6, 10 (2012) (first alteration in

original) (internal quotation marks omitted).  Therefore, for the Little Tucker Act to apply, "[a]

substantive right must be found in some other source of law, such as 'the Constitution, or any

Act of Congress, or any regulation of an executive department.'"  United States v. Mitchell, 463

U.S. 206, 216 (1983) (quoting United States v. Testan, 424 U.S. 392, 398 (1976)).  Moreover,

the claim based on that right "must be one for money damages against the United States, and the

claimant must demonstrate that the source of substantive law he [or she] relies upon 'can fairly

be interpreted as mandating compensation by the [f]ederal [g]overnment for the damages

sustained.'"  Id. at 216–17 (citation and footnote omitted) (quoting Testan, 424 U.S. at 400).

Here, as the defendant correctly argues, the plaintiff "has not provided, or even alluded

to, any Constitutional claim, Congressional Act[,] or executive regulation that could 'fairly be

interpreted [ ] as mandating compensation by the [f]ederal [g]overnment for the damages

sustained.'"  Def.'s Mem. at 19 (quoting Testan, 424 U.S. at 400).  Rather, the plaintiff bases

Count III of the Terry II Amended Complaint, as discussed above with regards to Counts III and

IV of the Terry I Amended Complaint, on the defendant's pay policy.  See Terry II Am. Compl.

¶ 53 ("Pursuant to the [d]efendant's own regulations, [the p]laintiff was entitled to [twenty-five

percent] Sunday [ ] pay for each shift that he worked which began on Sunday"); see also Pl.'s

Opp'n at 15 (arguing that the defendant "has a written and enforceable policy that governs

payment of [ ] Sunday [p]ay").  However, the defendant's pay policy is not a component of "the

Constitution, [ ] any Act of Congress, or any regulation of an executive department," Testan, 424

U.S. at 397.  Therefore, even if, as the plaintiff argues, "the [twenty-five percent] pay differential

that [he] seeks to enforce here is written in mandatory, rather than permissive, language[,]" Pl.'s

Opp'n at 16; see id. ("A full-time [ ] employee whose regular work schedule includes an [eight]-

hour period of service that is not overtime work, a part of which is on Sunday, is entitled to

additional pay at the rate of [twenty-five] percent of his[ or ]her hourly rate of basic pay for each

hour of work performed during that [eight]-hour period of service" (emphasis omitted) (quoting

id., Ex. 2 (Def.'s Pay Pol'y) ¶ 9(d))), the defendant's pay policy cannot be an independent source

of a substantive right for which the Little Tucker Act operates as a waiver of sovereign

immunity.[17]

    The plaintiff also argues that the Sunday pay requirement in the defendant's pay policy is

"mandated by statute" because the defendant's pay policy was "adopted under the authority of

---

[17] The parties dispute what the Court of Federal Claims held in Acevedo v. United States, 121 Fed. Cl. 57 (2015).
The plaintiff argues that Acevedo holds that a pay policy is enforceable under the Tucker Act when: "(1) the policy
is found in an agency rule, regulation[,] or written directive that is binding on the agency[,]" and "(2) the pay policy
is phrased in mandatory, rather than permissive, language."  Pl.'s Opp'n at 15 (citing Acevedo, 121 Fed. Cl. at 63).
The defendant argues that Acevedo states that "a plaintiff seeking to invoke the court's Tucker Act jurisdiction must
identify an independent source of a substantive right to money damages from the United States arising out of a
contract, statute, regulation[,] or constitutional provision" and that "those statutes and regulations must be such that
they can fairly be interpreted as mandating compensation by the [f]ederal [g]overnment for the damage sustained."
Def.'s Reply at 13 (quoting Acevedo, 121 Fed. Cl. at 63) (internal quotation marks omitted).  Acevedo clearly states,
as the defendant notes, see id., that the Tucker Act "does not confer any substantive rights" on its own and that "a
plaintiff seeking to invoke the court's Tucker Act jurisdiction must identify an independent source of a substantive
right to money damages from the United States arising out of a contract, statute, regulation[,] or contractual
provision."  121 Fed. Cl. at 63 (emphasis added).  And, as the defendant accurately argues, see Def.'s Reply at 13–
14, the defendant's pay policy is not such a "source of law," Mitchell, 463 U.S. at 216.  Therefore, the plaintiff has
failed to present any source entitling him to Sunday pay, and the Court lacks subject-matter jurisdiction over this
claim.

the Architect HR Act," which "requires the [defendant] to 'establish and maintain a personnel management system that incorporates fundamental principles that exist in other modern personnel systems.'"  Pl.'s Opp'n at 15 (quoting 2 U.S.C. § 1831).  However, although the Architect HR Act is undoubtedly an "Act of Congress[,]" Testan, 424 U.S. at 398, it cannot "fairly be interpreted as mandating compensation by the [f]ederal [g]overnment for the damages sustained[,]" Mitchell, 463 U.S. at 216–17 (quoting Testan, 424 U.S. at 400).  The Architect HR Act states that "[t]he [defendant] shall establish and maintain a personnel management system[,]" 2 U.S.C. § 1831(c)(1), which "shall at a minimum include" certain enumerated components, such as "[a] system which ensures that applicants for employment and employees . . . are appointed, promoted, and assigned on the basis of merit and fitness[,]" id. § 1831(c)(2)(A), and "[a] system for the classification of positions which takes into account the difficulty, responsibility, and qualification requirements of the work performed, and which conforms to the principle of equal pay for substantially equal work[,]" id. § 1831(c)(2)(C).[18]  The

---

[18] In full, the Architect HR Act requires that "[t]he [defendant's] personnel management system shall at a minimum include the following:"

> (A) A system which ensures that applicants for employment and employees of the [defendant] are appointed, promoted, and assigned on the basis of merit and fitness after fair and equitable consideration of all applicants and employees through open competition.

> (B) An equal employment opportunity program which includes an affirmative employment program for employees and applicants for employment, and procedures for monitoring progress by the [defendant] in ensuring a workforce reflective of the diverse labor force.

> (C) A system for the classification of positions which takes into account the difficulty, responsibility, and qualification requirements of the work performed, and which conforms to the principle of equal pay for substantially equal work.

> (D) A program for the training of . . . employees [of the defendant] which has among its goals improved employee performance and opportunities for employee advancement.

> (E) A formal performance appraisal system which will permit the accurate evaluation of job performance on the basis of objective criteria for all . . . employees [of the defendant].

(continued . . .)

Architect HR Act further prescribes a process for the "[i]mplementation of [the] personnel management system[,]" id. § 1831(d), including (1) submission of the plan to "the Speaker of the House of Representatives, the House Office Building Commission," and certain Congressional committees, id. § 1831(d)(1)(B); (2) implementation of "the plan not later than [ninety] days after the plan is submitted[,]" id. § 1831(d)(1)(C); and (3) "develop[ment of] a system of oversight and evaluation to ensure that the personnel management system . . . achieves the requirements of [the Architect HR Act] and compiles with all other relevant laws, rules[,] and regulations[,]" including annual reporting of "the results of its evaluation" to "the Speaker of the House of Representatives, the House Office Building Commission, the Committee on Rules and Administration of the Senate, and the Joint Committee on the Library[,]" id. § 1831(d)(2). However, nowhere in the Architect HR Act does it "mandat[e] compensation by the [f]ederal [g]overnment for [ ] damages sustained[,]" Mitchell, 463 U.S. at 216–17 (quoting Testan, 424 U.S. at 400); see also Def.'s Reply at 14 (arguing that "the Architect HR Act never even alludes to payment of money, much less mandat[es] money payments").

Therefore, even if the defendant's pay policy uses mandatory language to describe the payment of Sunday pay, neither the defendant's pay policy nor its authorizing statute, the Architect HR Act, are money-mandating statutes. Accordingly, the Court does not have

---

(. . . continued)

> (F) A fair and equitable system to address unacceptable conduct and performance by . . . employees [of the defendant], including a general statement of violations, sanctions, and procedures which shall be made known to all employees, and a formal grievance procedure.
>
> (G) A program to provide services to deal with mental health, alcohol abuse, drug abuse, and other employee problems, and which ensures employee confidentiality.
>
> (H) A formal policy statement regarding the use and accrual of sick and annual leave which shall be made known to all employees, and which is consistent with the other requirements of this section.

2 U.S.C. § 1831(c)(2).

jurisdiction under the Little Tucker Act over the plaintiff's claim that he is entitled to Sunday pay under the defendant's pay policy, and the Court must dismiss Count III of the <u>Terry II</u> Amended Complaint.

## IV.   CONCLUSION

For the foregoing reasons, the Court concludes that it must grant the defendant's partial motion to dismiss for lack of subject-matter jurisdiction.  Accordingly, the Court will dismiss Counts III and IV of the <u>Terry I</u> Amended Complaint and Count III of the <u>Terry II</u> Amended Complaint.

**SO ORDERED** this 14th day of June, 2021.[19]

REGGIE B. WALTON
United States District Judge

---

[19] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.